IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

DARRELL E. FARLEY,              )
      Plaintiff,              )          Civil Action No. 7:15-cv-00352
                                )
v.                              )          **REPORT & RECOMMENDATION**
                                )
HAROLD CLARKE, *et al.*,        )          By: Joel C. Hoppe
      Defendants.            )          United States Magistrate Judge

     Darrell E. Farley, a state prisoner proceeding pro se, filed suit under 42 U.S.C. § 1983 against Defendant prison officials, alleging numerous violations of his rights, both state and federal, including those under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; Article I, Sections Seven, Nine, Eleven, and Twelve of the Virginia Constitution; Title IX of the Education Act of 1972; the Prison Rape Elimination Act ("PREA") of 2003; Title II of the Americans with Disabilities Act ("ADA"); and § 504 of the Rehabilitation Act. Compl., ECF No. 1. The Defendants filed a motion for summary judgment and an accompanying brief in support. ECF Nos. 27–28. Farley responded with his own motion for summary judgment.[1] ECF No. 33. The Defendants filed a motion to substitute a party because of the death of one of the Defendants.[2] ECF No. 46. Farley then filed a motion for a preliminary injunction. ECF No. 50. The parties' respective motions are currently before me for report and

---

[1] Farley also filed a motion requesting the Court excuse the Prison Litigation Reform Act ("PLRA") exhaustion requirement. ECF No. 32. Given the content of his filing and the nature of the exhaustion requirement, *see infra* Pt. III.C.1, the Court construes this filing as a brief in opposition to the Defendants' motion for summary judgment.

[2] Defendants filed a notice informing the court that Elizabeth Thornton died on August 19, 2016. ECF No. 38. Per Rule 25(d) of the Federal Rules of Civil Procedure, Marie Vargo is automatically substituted for Thornton as a defendant for Farley's official capacity claims, and thus this motion should be granted as to those claims. This does not, however, affect Farley's individual capacity claims against Thornton.

1

recommendation under 28 U.S.C. § 636(b)(1)(B). ECF Nos. 34, 40.[3] Having considered the parties' memoranda and supporting materials and the applicable law, I find that Farley's claims are either unexhausted or fail as a matter of law. Accordingly, I respectfully recommend that the presiding District Judge grant the Defendants' motion to substitute a party and motion for summary judgment, deny Farley's motion for summary judgment and motion for a preliminary injunction, and dismiss this action.

## I. Procedural History

Farley is a prisoner in the Virginia Department of Corrections ("VDOC") and is currently housed at the Buckingham Correctional Center ("Buckingham"). *See* Compl. 1. He alleges that VDOC officials were responsible for various instances of retaliation, threats, failure to protect, and denial of access to counselors, all stemming from his alleged sexual victimization in the bathroom and shower at the Dillwyn Correctional Center ("Dillwyn") in July and August 2014. *See id.* at 6–22. Farley names the following Defendants: Harold Clarke, Director of VDOC; Elizabeth Thornton, former VDOC Corrections Operations Administrator; Rose Durbin, VDOC PREA/ADA Supervisor; Larry Edmonds, Dillwyn Warden; Marvin Smith, Institutional Investigator at Dillwyn; L. Mason, Grievance Coordinator at Dillwyn; and Agent Watson, a member of the VDOC Special Investigative Unit (collectively "Defendants").

On September 2, 2016, the undersigned Magistrate Judge conducted an evidentiary hearing on the parties' cross motions for summary judgment. Following the hearing, Farley submitted additional evidence and a supporting brief for the Court to consider. ECF Nos. 47, 48.

---

[3] In the first referral order, presiding Senior United States District Judge Jackson L. Kiser instructed the undersigned Magistrate Judge to address issues raised by the parties' motions for summary judgment, specifically 1) whether Farley had exhausted all available administrative remedies for his numerous claims, or whether the remedies were not available in accordance with 42 U.S.C. § 1997e(a); 2) whether qualified immunity applies to any of Farley's claims that were properly exhausted under 42 U.S.C. § 1997e(a); and 3) whether a party is entitled to summary judgment in whole or in part. *Id.* at 2.

2

Farley also filed a motion for a preliminary injunction. ECF No. 50. The Defendants did not respond to this new evidence, but did file a brief in opposition to Farley's motion for a preliminary injunction, ECF No. 51.

## II. Facts

Farley has been housed in VDOC facilities since January 24, 2014, when he was received at the Powhatan Reception and Classification Center ("Powhatan"). Durbin Aff. ¶ 4, ECF No. 28-5. Farley has met with counselors and mental health staff throughout his time in the VDOC. *Id.* He was also housed at the Green Rock Correctional Center ("Green Rock") before being transferred to Dillwyn on July 2. *Id.* ¶ 6. Farley alleges that he was gang raped at Powhatan and also raped at Green Rock. Pl's. Br. in Opp'n Defs.' Mot. Summ. J. & in Supp. Pl's. Mot. Summ. J. ("Pl. Br. Opp'n") 13, ECF No. 33. Farley identifies these prior sexual victimizations as the impetus for his requests for a single cell, *id.*, requests which continued throughout Farley's time at Dillwyn, Thornton Aff. ¶ 6, ECF No. 28-4, at 2. Farley claims these incidents induced anxiety, emotional distress, and post-traumatic stress disorder ("PTSD"), all of which continued to affect him at Dillwyn, Pl. Br. Opp'n 13, and for which he has received treatment at Buckingham, Hr'g Tr. 162:12–18. Farley thus contends that he is disabled, Compl. 6, on the basis of his depression, anxiety, PTSD, asthma, and hearing and vision problems, Hr'g Tr. at 162:5–8. Warden Edmonds, however, stated in his affidavit that Farley had no diagnosed physical or mental disabilities.[4] Edmonds Aff. ¶ 4, ECF No. 28-1.

Upon arriving at Dillwyn, Farley was placed in a dormitory style unit along with other offenders. Warden Edmonds described the dormitories at Dillwyn as units with two sides. Each side houses inmates who have their own bunk and consists of an open shower and bathroom

---

[4] The only relevant medical evidence before the Court indicates that Farley had been diagnosed with major depressive disorder by prison doctors, ECF No. 47-2, at 49–50, but does not confirm or address any of Farley's other alleged disabilities.

3

facilities. Hr'g Tr. 121:20–24. Warden Edmonds testified that the beds in the front of the dormitories were under twenty-four hour surveillance. *Id.* at 126:14–18. He also stated that the shower area can be viewed by security staff twenty-four hours a day, seven days a week, and by correctional officers who continuously make rounds and walk by the facilities. *Id.* at 129:11–18.

Within a week of his arrival at Dillwyn, Farley submitted an informal complaint on July 8, ECF No. 47-1, at 52, and called the Sexual Abuse Hotline for offenders on July 9 and again on July 10, alleging that other offenders in his unit were sexually harassing him, Edmonds Aff. ¶ 5. Farley was moved to a different bed in the front of the dorm on July 9 so that he could be monitored more closely. Edmonds Aff. ¶ 6. On July 12, Farley made a written request seeking permission to use the shower alone after 11:30 pm to ensure his safety, which Warden Edmonds denied. ECF No. 47-1, at 67–68. On July 14, Farley filed his first regular grievance, alleging that inmate Brown made "degrading sexual intimidation remarks,"and inmate Neff asked other inmates if they would kill, injure, or rape all sex offenders–a group with which Farley identifies himself[5]–and harm any guards who intervene. *Id.* at 22. Neff also said he knew Farley was "dropping notes" and if he came back to the dorm he would be "rolled out." *Id.* In internal communications, Mason noted that the grievance would be considered a PREA issue and that it involved various inmates seriously threatening Farley with harassment and even death. Defs. ex. 11, ECF No. 43-1, at 67. In response, Smith interviewed Farley, the Dillwyn Investigation Office reviewed the rapid eye video surveillance, and Farley received a mental health evaluation. *Id.* On July 16, Farley was moved to a different dormitory for safety and security reasons and to accommodate his job assignment. *Id.*; Edmonds Aff. ¶ 6. Farley was placed in a bed in the front of this new dormitory to continue to monitor his safety, *id.*, despite the Investigation Office determining that his recent allegations of harassment were unfounded, Defs. ex. 11.

---

[5] Farley alleges that the nature of his offense places him in a "high target risk group." Compl. 6.

Near the end of July, Farley alleges that a fellow inmate, who he identifies as Graves, ECF No. 47-1, at 10, sexually assaulted him. Compl. 9. Farley states that he began having trouble with the inmate in question when this inmate reached under the partition between the toilets and touched Farley's private areas. *Id.* Farley also claims the inmate then started to approach him in the shower and propositioned him for sexual acts in exchange for payment. *Id.* Farley claims he resisted these advances and changed his routine to avoid this inmate. *Id.* He also alleges that he wrote to Edmonds and Smith, *id.*, but he has not produced copies of these writings or detailed what he wrote. Farley alleges that this inmate assaulted him by anally penetrating Farley in the Dillwyn showers. *Id.*

On August 4, Dillwyn officials received an unsigned letter alleging various claims of sexual assault. Smith Aff. ¶ 5, ECF No. 28-3.[6] On August 5, a Dillwyn official identified Farley as the author of the letter based on the handwriting, and he approached Farley. *Id.* Farley admitted to writing the letter, and Dillwyn mental and medical health officials determined that he should be transferred to the Medical College of Virginia/Virginia Commonwealth University ("MCV/VCU") hospital in Richmond, Virginia, for further evaluation. *Id.* ¶ 7. The MCV/VCU evaluation revealed that Farley had some injury to his rectum. *Id.* ¶ 8. Farley returned to Dillwyn and was moved to the infirmary on August 6. Edmonds Aff. ¶ 6.

Simultaneously, an investigation into Farley's allegations began. Both parties put forward differing accounts of how the investigation transpired. Farley asserts that during a meeting with Watson, Smith, and Thornton, he repeatedly requested a lawyer and to be read his *Miranda* rights,[7] requests which were never granted, Compl. 10; he was accused of penetrating himself

---

[6] The letter itself was not submitted into evidence.

[7] *Miranda v. Arizona*, 384 U.S. 436 (1966).

during this meeting, *id.*; Thornton retaliated and discriminated against him when she told him that people with his offense deserve all that happens to them and threatened him with a retaliatory transfer, *id.* at 12–13; and Watson and Smith told Farley that he needed to stop "crying wolf" and he "would end up like Offender Rose in Wallen's Ridge [State Prison]," *id.* at 13.

The Defendants put forward a different version of the investigation.[8] They assert that Watson first interviewed Farley on August 8, at which time Farley claimed that the accused inmate fondled him in the toilet area on July 31 and then forcibly sodomized him in the shower on August 3. ECF No. 44, at 2. Thornton stated by affidavit that she, along with Smith and Warden Edmonds, then met with Farley in the medical department on August 12. Thornton Aff. ¶ 5. She claimed that at no point during this meeting did she threaten, retaliate against, or tell Farley that he got what he deserved because of his crime. *Id.* In a follow-up interview with Watson on August 20, Farley altered his story and alleged that while the inmate did not insert his penis into Farley's anus, the inmate did penetrate Farley with his finger. ECF No. 44, at 2. The accused inmate was interviewed on August 21 and admitted to penetrating Farley with his finger, but claimed that it was consensual. *Id.* at 3. Watson conducted a third interview with Farley on August 27, during which Farley claimed that while he did not consent to sexual activity, he did not rebuff the accused's advances either. *Id.* at 2. Watson and Smith both testified that during the course of the investigation, Farley never asked for a lawyer nor was he denied one, Hr'g Tr. 81:10–14, 108:14–16; Farley was never accused of penetrating himself, *id.* at 81:14–15, 108:25–

---

[8] Their accounts are by no means uniform. Smith testified that the meeting took place, but Watson denied ever meeting with Farley when Thornton was present. In her affidavit, Thornton describes meeting with Farley along with Edmonds and Smith, and Edmonds confirmed her recollection.

109:1; Farley was never told that he would end up like Offender Rose at Wallen's Ridge,[9] *id.* at 81:19–24, 109:10–12; no one threatened to retaliate against Farley, *id.* at 82:6–13, 109:4–5; and although Farley was never read *Miranda* rights during any of the interviews, this was because Farley was the victim, rather than the suspect, of the alleged sexual assault, *id.* at 81:2–9, 108:17–22. Conversely, the inmate Farley accused of sexual assault was read *Miranda* rights when he was interviewed. *Id.* at 108:23–24. Defendants Watson and Smith also reviewed the rapid eye video surveillance for the days Farley alleged sexual assault and determined that there was only one date, August 2, when both Farley and the accused inmate were in the bathroom area at the same time. Edmonds Aff. ¶¶ 8, 9. Watson testified that the video surveillance review did not verify Farley's claims of sexual assault.[10] ECF No. 44, at 1. Ultimately, the investigation concluded by finding that Farley's claims of sexual assault were unsubstantiated. Smith Aff. ¶ 9.

Farley remained in the infirmary until September 16, when he was returned to the general population.[11] Edmonds Aff. ¶ 6. Farley returned to the same bed he occupied prior to being transferred to the infirmary, and he remained there until his transfer to Buckingham. *Id.* On September 16, Durbin arranged for Farley to speak directly with a victim advocate over the phone. Durbin Aff. ¶ 7. Durbin testified that although advocacy services could be provided either in person or on the phone, she initially tries to arrange a phone call because limited availability

_____

[9] Watson testified that a prisoner by the last name of Rose was transferred to a higher level institution after making a number of false complaints. Hr'g Tr. 111–12. Watson said he told Farley about Rose's transfer because he did not want Farley to receive institutional charges for making false statements. *Id.*

[10] Farley asserts that Defendant Watson admitted at the hearing that the video surveillance system does not allow the viewer to see offenders below the waist, so his genital area would not be visible on review of the tapes. Pl. Rep. Br. 1–2, ECF No. 48. Farley does not explain how a waist-up view would entirely obscure the alleged sexual assault.

[11] Farley claims that during this period he was kept in "medical isolation," where he did not have the ability to lodge any complaints or access the grievance procedure. *See, e.g.*, Compl. 10. This assertion contradicts evidence showing that he submitted a letter and regular grievances dated on days falling within this range. *See, e.g.*, ECF No. 47-1, at 21, 23; ECF No. 47-2, at 22–23.

7

of advocates makes in-person visits harder to schedule and because phone calls create less disruption at the facilities. Hr'g Tr. 137:16–23. During this phone call, Farley allegedly asked the advocate for personal contact information, *id.* at 138:5–6, although Farley characterized his request as one for general contact information for the advocacy organization and not for the individual advocate's personal information, *id.* at 150:1–7. Durbin informed Farley that the advocate would not meet with him in person and he would not be provided the advocate's personal contact information, but he could continue to access advocacy and emotional support services by any telephone available to inmates. Durbin Aff. ¶ 7.

On October 8, VDOC arranged to transfer Farley from Dillwyn to Buckingham, which is less than a mile away. *Id.* ¶ 8. Dillwyn is a level 2 correctional facility, whereas Buckingham is a level 3/4 correctional facility. Hr'g Tr. 113:9–15. Buckingham's design differs from that of Dillwyn's, as it offers single cells and individual showers. Clint Davis, the former Assistant Warden at Buckingham, testified to the design of the Buckingham showers at the evidentiary hearing. He stated that there were four individual showers in a pod, two on each side of a control room, enabling the control room to monitor the inmates going into and out of the shower. *Id.* at 72:15–18. Farley alleged in numerous regular grievances and informal complaints that this transfer was done in retaliation for his PREA complaints, while the Defendants maintain that it was done to accommodate his requests for a single cell, an option available at Buckingham but not at Dillwyn. *See, e.g.*, Thornton Aff. ¶ 6, ECF No. 28-4. Durbin testified that the decision to transfer Farley to Buckingham seemed like a logical choice to ensure his safety because of the availability of single cells and the design of its showers. *Id.* at 135:6–9, 139:7–9. Durbin also stated that she made arrangements for Farley to have a similar job and a single cell upon his arrival at Buckingham. *Id.* at 139:11–16. Once at Buckingham, Farley continued to file informal

complaints and regular grievances concerning his time at Dillwyn and his transfer. Farley conceded during the hearing, however, that he had not experienced any problems at Buckingham since his transfer and that he was doing well in his single cell. *Id.* at 168:3–6.

### III. Discussion

A.     *Farley's Claims*

In his Complaint, Farley raises eighteen enumerated claims in the causes of action section, Compl. 16–22, and one additional claim throughout. The claims are as follows:

- Claim 1

Defendants violated PREA and the ADA by excluding Farley from the protection of those laws. *Id.* at 16. This exclusion denied him the equal protection of these laws and the ability to participate in VDOC's PREA process designed to "prevent and respond to allegations of sexual misconduct victimization and harassment." *Id.*

- Claim 2

Defendants violated Farley's Eighth Amendment right to be free from cruel and unusual punishment by subjecting him to an "ongoing campaign of exclusion from laws and policies designed to protect him" because of the nature of his crime, his sexual orientation, and his known disabilities. *Id.* This exclusion led to sexual victimization. *Id.*

- Claim 3

While conducting the investigation into Farley's allegations of sexual assault, Defendants Thornton, Smith, and Watson denied Farley his *Miranda* rights and accused Farley of penetrating himself. *Id.* at 17.

- Claim 4

During the same investigation, Defendants Thornton, Smith, and Watson repeatedly denied Farley's requests for an attorney, in violation of his Sixth Amendment right to counsel. *Id.*

- Claim 5

During the same investigation, Defendants Thornton, Smith, and Watson violated Farley's Fourteenth Amendment right to due process. *Id.*

- Claim 6 and Claim 12

Defendants Edmonds, Thornton, Smith, and Clarke failed to protect Farley from the alleged sexual victimization that took place in the open shower facility at Dillwyn because they denied his request to shower alone. *Id.* at 17–18. Defendants Edmonds, Thornton, Smith, and Clarke were deliberately indifferent to his risk of sexual victimization, *id.* at 18, 20, and this conduct violated the Eighth Amendment (Claim 6) and Article I, Section 9 of the Virginia Constitution (Claim 12), *id.*

- Claim 7 and Claim 14

Defendant Mason hindered Farley's ability to file grievances in violation of his right to petition the government under the Fourteenth Amendment (Claim 7) and Article I, Section 12 of the Virginia Constitution (Claim 14). *Id.* at 18, 20.

- Claim 8

Defendants violated Farley's Fourteenth Amendment right to equal protection. *Id.* at 18–19.

- Claim 9

Defendants Clarke, Thornton, Durbin, Watson, Edmonds, and Smith violated § 504 of the Rehabilitation Act by denying Farley access to a rape counselor and the victim advocate center. *Id.* at 19.

- Claim 10

Defendants Clarke, Thornton, Durbin, Edmonds, and Smith deprived Farley of his rights pursuant to Title IX of the Education Act of 1972, 20 U.S.C. §§ 1681–1688, by allowing sexual harassment to take place in an educational setting that receives federal funds. *Id.*

- Claim 11

Defendants violated Farley's state constitutional right to due process and equal protection under Article I, Section 11 of the Virginia Constitution. *Id.*

- Claim 13

Defendants violated Article I, Section 7 of the Virginia Constitution, which prohibits the suspension of laws without the consent of the people, by excluding Farley from the protections of unidentified laws and policies he believes Defendants suspended. *Id.* at 20.

- Claim 15

Defendants violated Farley's Fourteenth Amendment right to due process and his First Amendment right to freedom of speech by denying him access to a victim advocate as well as an advocate from a religious organization. *Id.* at 21.

- Claim 16 and Claim 18

The VDOC grievance policy as applied by Defendants Clarke, Smith, Edmonds, and Mason violates Farley's ability to petition the government and redress grievances, making it unconstitutional (Claim 16), *id.*, and the VDOC grievance policy as applied by all Defendants violates Article I, Section 12 of the Virginia Constitution (Claim 18), *id.* at 22.

- Claim 17

VDOC's policy as applied by Defendants resulted in Farley being excluded from the protections of PREA, making the VDOC policy unconstitutional by denying Farley equal protection. *Id.* at 21.

- Retaliation Claim

Defendants retaliated against Farley for filing PREA complaints by transferring him from Dillwyn to Buckingham.[12]

## B. *Meritless Claims*

The Prison Litigation Reform Act ("PLRA") enables a court, on its own motion, to dismiss such claims "brought with respect to prison conditions under section 1983 . . . , or any other Federal law, by a prisoner . . . if the court is satisfied that the action is frivolous [on its face] . . . [or] fails to state a claim upon which relief can be granted." 20 U.S.C. § 1997e(c)(1); *see also id.* § 1997e(c)(2). "To be frivolous, a claim must rely on an 'indisputably meritless legal theory' or a 'clearly baseless' or 'fantastic or delusional' factual scenario." *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (quoting *Neitzke v. Williams*, 490 U.S. 319, 327–28 (1989)). Thus, before addressing the exhaustion issue, the Court takes up some of Farley's claims that are clearly without merit. *See Woodford v. Ngo*, 548 U.S. 81, 101 (2006) (explaining that the district court has the power under § 1997e(c)(2) to "dismiss plainly meritless claims without first addressing what may be a much more complex question, namely, whether the prisoner did in fact properly exhaust available administrative remedies"). The Court recommends dismissing with prejudice ten of Farley's claims, in whole or in part, on this basis.

---

[12] While not explicitly enumerated as a claim, throughout the Complaint Farley asserts he was retaliated against for invoking PREA protections. Cognizant of a court's obligation to construe pro se pleadings liberally, and as the Defendants also addressed a retaliation claim in their brief, *see* Def. Br. 22–24, ECF No. 28, the Court will construe Farley's Complaint as raising a retaliation claim.

Farley attempts to bring a cause of action in Claim 1 under PREA for the Defendants' alleged violations. He contends that the Defendants are not in compliance with PREA because they have excluded him from the protection of the law. Farley misapprehends the applicability of PREA to his case. The PREA statute acknowledges that prison rape is a problem and establishes a construct for federal, state, and local prisons to address that problem. *See* 42 U.S.C. §§ 15601–15609. It does not, however, create a cause of action for individual inmates who may have been victimized to bring suit against a jailer. *See Muhammad v. Barksdale*, No. 7:15cv541, 2016 WL 627359, at \*2 n.2 (W.D. Va. Feb. 16, 2016) ("Muhammad does not assert any separate legal claim against defendants under PREA itself, nor could he do so."); *Chapman v. Willis*, No. 7:12cv389, 2013 WL 2322947, at \*4 (W.D. Va. May 28, 2013) ("There is no basis in law for a private cause of action under § 1983 to enforce a PREA violation."); *Chinnici v. Edwards*, No. 1:07-cv-229, 2008 WL 3851294, at \*3 (D. Vt. Aug. 12, 2008) ("[PREA] does not grant prisoners any specific rights."). In that respect, the PREA component of Claim 1 fails because the statute simply does not provide Farley with a cognizable cause of action against the Defendants.

Farley's *Miranda* claim (Claim 3) is meritless. *Miranda* provides that a person must be advised of his right to remain silent when he is placed in custody and interrogated by law enforcement. *Miranda*, 384 U.S. at 444. Because "[p]risoner interrogation simply does not lend itself easily to analysis under the traditional formuations of the *Miranda* rule," *United States v. Conley*, 779 F.2d 970, 973 (4th Cir. 1985), the Fourth Circuit has adapted the requirements of *Miranda* to the prison setting. Specifically, *Miranda* warnings are required when an inmate is restricted to the point that it "'implies a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement.' Thus, the court look[s] to the circumstances of the interrogation to determine whether the inmate was subjected to more than

13

the usual restraint on a prisoner's liberty to depart." *Id.* (quoting *Cervantes v. Walker*, 589 F.2d 424, 427 (9th Cir. 1978)). In doing so, the court considers factors such as "the primary purpose for which the questioning was initiated" and "the extent to which the inmate is confronted with evidence of guilt." *United States v. Lovell*, 317 F. Supp. 2d 663, 668–69 (W.D. Va. 2004).

Here, the investigation during which Farley claims to have been denied his *Miranda* rights was undertaken for the purpose of investigating his allegations that he was sexually assaulted by another inmate. *See supra* Pt. II. He was treated as the victim during the entire investigation. No evidence suggests the interview took place in conditions that subjected Farley to more than the usual restraint on a prisoner's liberty. The purpose of the Defendants' questioning of Farley was to gain information to see if his allegations could be substantiated. Although the Defendants questioned the truthfulness of his complaint and Farley alleges that he was accused of penetrating himself, he does not allege that he was accused of sexual assault or another crime, and at no point was Farley confronted with evidence of guilt. Therefore, Defendants Thornton, Smith, and Watson were under no obligation to read him *Miranda* rights during their investigation of his sexual assault complaint.

Farley's Sixth Amendment right to counsel claim (Claim 4) is meritless because the Sixth Amendment right to counsel is offense specific and only attaches upon the initiation of formal judicial proceedings. *See McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) ("The Sixth Amendment right, however, is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, 'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" (quoting *United States v. Gouveia*, 467 U.S. 180, 188 (1984))). Here, even assuming Farley requested a lawyer during the

14

investigation conducted by Thornton, Smith, and Watson, he did not have a Sixth Amendment right to counsel. As noted above, the named Defendants conducted the investigation as a result of Farley's allegation of sexual assault, and Farley was not a subject of this investigation. Farley did not face any charge for which this Sixth Amendment right could attach, and his interview did not constitute the initiation of adversary judicial criminal proceedings. Therefore, Farley had no Sixth Amendment right to counsel during this investigation.

Farley's Title IX claim (Claim 10) is meritless. While prisoners can invoke the protections of Title IX when alleging sexual harassment, courts have viewed such claims with caution. *See Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 927 (D.C. Cir. 1996) ("[W]e admit to grave problems with the proposition that work details, prison industries, recreation, and religious services and counseling have anything in common with the equality of *educational* opportunities with which Title IX is concerned."). Furthermore, the Court has not found any cases, nor have any been identified by the parties, where Title IX has been applied to sex discrimination occurring in the prison context outside of an educational program or setting. Farley has not pleaded any facts linking the alleged assault, discrimination, or retaliation to anything education-related.[13] Rather, Farley consistently alleges that the sexual assault occurred in the bathroom and shower at Dillwyn. Even if Farley had pleaded facts sufficient to establish that he participated in educational programs at Dillwyn, the mere existence of, and his participation in, these programs would not bring his claims within the scope of Title IX. Additionally, none of the Defendants would be proper parties for a Title IX claim, as individual officials cannot be held liable in their personal capacities under Title IX. *See Bracey v.*

---

[13] Farley did mention that he had begun to "attend school" at Dillwyn, Compl. 8, but he does not elaborate on the extent of his participation in the educational programming.

15

*Buchanan*, 55 F. Supp. 2d 416, 419 (E.D. Va. 1999) ("It is impossible to bring a Title IX action against an individual.").

Farley's claim that the Defendants violated the Virginia Constitution by suspending the laws (Claim 13) is meritless. This rarely cited section of the Virginia Constitution,[14] when it has been invoked by the Supreme Court of Virginia, has primarily been applied to the actions of the sitting Governor. *See Howell v. McAuliffe*, 788 S.E.2d 706 (Va. 2016) (holding that Virginia Governor's executive order reinstating the right to vote to approximately 206,000 Virginians convicted of felonies without the consent of the people's representatives violated this constitutional provision). Farley provided no explanation or argument for how he believes this section of the Virginia Constitution applies to a single alleged violation of the law or that the Defendants, as opposed to a high ranking member of the executive branch such as a Governor, could run afoul of this provision. *See id.* at 722. Moreover, to the extent he argues the Defendants suspended the laws by not affording him the protections of VDOC's PREA policy and grievance procedure, this argument merely recycles Farley's PREA violation argument.

Farley's claims regarding his access to the grievance procedure and a victim advocate on constitutional grounds are meritless. Farley alleges that Defendant Mason hindered his ability to file grievances, violating his due process rights under the Fourteenth Amendment (Claim 7) and the Virginia Constitution (Claim 14). Farley also challenges the VDOC grievance procedure, *see infra* Pt. III.C.2 (describing the VDOC policy in detail), as applied to him, claiming that this policy as applied is unconstitutional per the Federal (Claim 16) and Virginia (Claim 18) Constitutions because its application by the Defendants hindered his ability to access and benefit from the VDOC grievance procedure. In the Fourth Circuit, however, Farley does not have a

---

[14] Article I, Section 7 of the Constitution of Virginia provides, "That all power of suspending laws, or the execution of laws, by any authority, without consent of the representatives of the people, is injurious to their rights, and ought not to be exercised."

16

constitutional right to access this grievance procedure. *See Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) ("[T]he Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by the state."). Similarly, Farley's claim that the Defendants denied him access to a victim advocate in violation of his First Amendment rights (Claim 15) is also meritless. Just like Farley does not have a constitutional right to access the VDOC grievance procedure, *see Adams*, 40 F.3d at 75, he does not have a constitutional right to a victim advocate provided by the VDOC, *see Farley v. Stoots*, No. 7:14cv270, 2015 WL 6690237, at *8 (W.D. Va. Nov. 2, 2015) ("Plaintiff does not have an independent constitutional right to a rape counselor . . . ."). Because the law is clearly established that Farley does not have these rights, he has no cause of action and his constitutional claims concerning his ability to access these procedures and a victim advocate are meritless.

Accordingly, I recommend that Claims 1 (as to PREA), 3, 4, 7, 10, 13, 14, 15 (as to First Amendment right to victim advocate), 16, and 18 be dismissed with prejudice as they are facially frivolous and because Farley cannot state a claim for relief under the asserted causes of action.

C.    *The PLRA Exhaustion Requirement*

1.    *Legal Standard*

The PLRA requires inmates to properly exhaust "such administrative remedies as are available" before filing any federal lawsuit "with respect to prison conditions." 42 U.S.C. § 1997e(a); *see also Jones v. Bock*, 549 U.S. 199, 211 (2007); *Woodford*, 548 U.S. at 93; *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 736–41 (2001). "There is no question that exhaustion is mandatory under the PLRA," *Jones*, 549 U.S. at 211, and that courts cannot excuse an inmate's failure to exhaust available remedies "in accordance with the [prison's] applicable procedural rules," *Woodford*, 548 U.S. at 88. In order to satisfy this

requirement, the Supreme Court has held that "proper exhaustion of the remedies is necessary." *Woodford*, 548 U.S. at 83; *see also Jones*, 549 U.S. at 218 ("Compliance with the prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'"). The PLRA does not, however, require total exhaustion, meaning that if a prisoner's complaint includes both exhausted and unexhausted claims, the court proceeds with the properly exhausted claims. *See Jones*, 549 U.S. at 219–24.

Exhaustion is an affirmative defense that the defendant must plead and prove on a claim-by-claim basis. *Id.* at 216. If the defendant shows that the prisoner failed to properly exhaust his claims under the applicable grievance procedure, the burden shifts to the inmate to present facts demonstrating that administrative remedies were not actually "available" to him. *Graham v. Gentry*, 413 F. App'x 660, 663 (4th Cir. 2011) (citing *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008)); *Robertson v. Roberts*, No. 7:13cv560, 2014 WL 5801893, at *1 & n.1 (W.D. Va. Nov. 7, 2014) (noting that prisoner must prove unavailability of administrative remedies by a preponderance of the evidence). A remedy is "available" when there is "the possibility of some relief for the action complained of," *Booth*, 532 U.S. at 739, but is not considered available "if a prisoner, through no fault of his own, was prevented from availing himself of it," *Moore*, 517 F.3d at 725. Requiring exhaustion of administrative remedies gives prison officials the time and opportunity to address the inmate's complaint internally before being haled into federal court. *Woodford*, 548 U.S. at 89; *Fletcher v. Menard Corr. Ctr.*, 623 F.3d 1171, 1173–74 (7th Cir. 2011); *Moore*, 517 F.3d at 725. "Where the prison provides an administrative grievance procedure, the inmate must file a grievance raising a particular claim and pursue it through all available levels of appeal." *Aziz v. Pittsylvania Cty. Jail*, No. 7:11cv39, 2012 WL 263393, at *4 (W.D. Va. Jan. 30, 2012). An inmate's failure to do so precludes a court from reviewing such an

unexhausted claim. *See Jones*, 549 U.S. at 219–20 ("All agree that no unexhausted claim may be considered.").

      2.     *Virginia's Offender Grievance Procedure*

VDOC has a multistep procedure for addressing most issues related to prison life. *See* VDOC Offender Grievance Procedure, Operating Procedure ("OP") 866.1, ECF No. 28-2, at 5–17. Generally, the inmate must first try to resolve the problem informally by submitting an informal complaint to the appropriate administrator. *See* OP 866.1 § V ¶¶ B–F. An inmate making a complaint concerning sexual abuse or sexual harassment, however, is not required to use the informal complaint process, but prison staff shall nonetheless accept reporting of any PREA related issues submitted in an informal complaint. *Id.* § V ¶ A. If the inmate does not like the prison's response, or if the prison does not respond within fifteen days, he can then submit a regular grievance to the Facility Unit Head. *See id.* § V ¶¶ B–C.

Generally, the inmate must file a regular grievance form within thirty days of the incident or occurrence he wants resolved, but there is no time limit in cases regarding an allegation of sexual abuse. *See id.* § VI ¶ A.1. Submitting a regular grievance is one means by which an inmate can report a PREA related issue.[15] *Id.* § VI ¶ B.2. The inmate can raise only one issue per grievance form and "must attach any required documentation," such as an informal complaint, showing that he tried to resolve the issue informally. *Id.* § VI ¶ A.2. Grievances that do not meet those criteria are promptly returned with a written explanation indicating why the form was rejected at intake. *See id.* § VI ¶ B. The inmate can appeal the intake decision to the Regional Ombudsman within five days or resubmit the form as instructed. *See id.* If appealed, the

---

[15] VDOC's PREA operating procedure, OP 038.3, provides the other methods by which an inmate could report a PREA violation. Because Farley used the standard grievance procedure under OP 866.1 to report all of his grievances, including those that are PREA related, the Court will limit the discussion of the exhaustion issue to Farley's compliance with OP 866.1.

19

Regional Ombudsman can uphold the decision to reject at intake, reject the appeal because the inmate failed to file it within five days, or accept the regular grievance for logging if he or she deems it meets the criteria for intake. *Id.* The Regional Ombudsman's decision is final, and there is no further review of the intake decision. *Id.*

If a regular grievance is accepted at intake for logging, there are three possible levels of review. At "Level I" review, the prison's Grievance Coordinator must review and resolve any properly filed grievance within thirty days from the date it was received. *See id.* § VI ¶ C.1. If the Coordinator denies the grievance or fails to timely respond, the inmate can appeal to "Level II" review by a regional administrator. *See id.* § VI ¶ C.2. Level II, which has a twenty-day response deadline, is the final level of review for most issues related to prison life. *See* Mason Aff. ¶ 8, Jan. 29, 2016; *see also* OP 866.1 § VI ¶ C. The inmate must complete the regular grievance procedure in order to properly exhaust available administrative remedies. *See Duncan v. Clarke*, No. 3:12cv482, 2015 WL 75256, at *5 (E.D. Va. Jan. 6, 2015) ("Generally, in order to satisfy the exhaustion requirement, the inmate must file a grievance raising the claim and pursue the grievance through all available levels of appeal, prior to bringing his or her action to court."). Copies of all returned grievances, processed grievances, and appeals are kept in the inmate's grievance file. *See* OP 866.1 § VIII ¶ A.

> 3.    *Analysis*

The Defendants allege that Farley failed to exhaust all of his claims contained in the complaint. Defs. Br. Supp. 16–18, ECF No. 28. After disposing of Farley's frivolous claims, twelve claims remain, in whole or in part,[16] to analyze under the Defendants' exhaustion defense. Because exhaustion is an affirmative defense, the Defendants bear the burden of proof. To

---

[16] The remaining claims are Claims 1 (as to ADA), 2, 5, 6, 8, 9, 11, 12, 15 (as to denial of access to a religious advocate), and 17, and the Retaliation Claim.

succeed on such a defense at the summary judgment stage, the Defendants "must show that the evidence is so one-sided that no reasonable factfinder could find that [the plaintiff] was prevented from exhausting his administrative remedies." *Hill v. O'Brien*, 387 F. App'x 396, 399 (4th Cir. 2010) (per curiam). For the reasons set out below, I recommend finding that the Defendants prevail on their exhaustion defense for the ADA element of Claim 1, the due process element of Claim 11, and the religious advocate element of Claim 15; for the remainder of the claims, I recommend finding that Farley has properly exhausted his administrative remedies.

a.     *Unexhausted Claims*

Farley failed to properly exhaust three of his claims and therefore the Defendants are entitled to summary judgment on these claims. For the due process element of Claim 11, there is simply nothing in any of his regular grievances, even when construing them liberally and in the light most favorable to Farley, that could put the Defendants on notice that Farley believed he had not been afforded due process generally, as opposed to the more specific claim that he had not been afforded due process during the Smith, Watson, and Thornton's investigation (Claim 5). For Claim 1's ADA element and Claim 15's denial of access to a religious advocate element, there are no properly exhausted regular grievances containing these claims.

To be sure, Farley submitted to the Court three regular grievances and an informal complaint, all dated November 12, 2014, *see* ECF No. 47-1, at 8–14, complaining generally about lack of protection and violation of PREA and the ADA. Farley asserted in his affidavit that all of these documents were returned to him unanswered, and he provided the envelope they were allegedly returned in, which was poststamped November 18, 2014. *See id.* at 2, 7. Unfortunately for Farley, evidence of an unanswered grievance, without more, is insufficient to show that he properly exhausted his administrative remedies. VDOC policy indicates that when a

prisoner does not receive a response at a certain level of the grievance procedure, the non-response is treated as a denial, and the prisoner must appeal to the next available level of the grievance procedure to properly exhaust. OP 866.1 § VI ¶ D.5; *see also Anderson v. Brown*, No. 7:14cv184, 2015 WL 926052, at *6 (W.D. Va. Mar. 4, 2015) (concluding that the plaintiff did not properly exhaust his claims when he alleged that prison officials did not respond to his grievance because he failed to follow prison policy and appeal the nonresponse), *adopted by* 2015 WL 1636746 (Apr. 13, 2015); *Strickland v. Wang*, No. 7:11cv358, 2013 WL 865847, at *4 (W.D. Va. Feb. 20, 2013) ("[Plaintiff's] claim that he submitted a grievance form to an officer and received no response does not satisfy his duty to exhaust available remedies."), *adopted by* 2013 WL 866075 (Mar. 7, 2013). Here, when Farley's November 12 regular grievances were returned to him unanswered, he should have appealed to the Regional Ombudsman. Because there is no evidence of this appeal, these regular grievances are not properly exhausted. Therefore, his claims that appear only in these regular grievances cannot be considered on the merits.[17]

---

[17] A review of the evidence also casts serious doubts on the authenticity of these documents submitted by Farley. Farley filed with the Court three regular grievances he claims to have submitted to Dillwyn on November 12, 2014, that were returned to him unanswered. One was initially undated when filed with the Court on September 9, 2016, ECF No. 45, at 25–26, but dated November 12, 2014, when submitted again a week later on September 15, 2016, ECF No. 47-1, at 13–14. The second is dated November 12, 2014, and has a blank intake form. *Id.* at 10–11. The third is identical to the regular grievance dated November 26, 2014, *id.* at 37, except that November 12 is written over the date and also is written near the top of the form, *id.* at 8. Sections for the intake response and appeal are marked, but unsigned, and the intake response is dated December 2, 2014, two weeks after Farley says the grievances were returned to him. *Id.* at 9. Notably, Farley also contends in his affidavit that the November 26, 2014, regular grievance was his attempt to comply with the grievance procedure by fixing a regular grievance from November 20, 2014, that had been rejected for containing insufficient information. *See id.* at 4 (explaining the contents of all his filings), 35–36 (the insufficient grievance from November 20, 2014, and the accompanying intake form).

Case 7:15-cv-00352-JLK-JCH   Document 52   Filed 12/27/16   Page 22 of 47   Pageid#: 884

Accordingly, I recommend that Claims 1 (as to ADA), 11 (as to due process), and 15 (as to denial of access to religious advocate) be dismissed without prejudice because Farley failed to properly exhaust his administrative remedies regarding these claims.

b.    *Properly Exhausted Claims*

For the remainder of the Farley's claims, I recommend finding that he properly exhausted his available remedies. It is worth noting the Defendants did not produce most of the documents that Farley submitted to the VDOC through the grievance process. Farley's initial filings contained more evidence of his attempts to exhaust than the evidence the Defendants submitted, as did his supplemental filings received after the evidentiary hearing, to which the Defendants never responded. This factor impacted the Defendants' ability to meet their burden. Furthermore, the Defendants relied on two arguments for their exhaustion defense, specifically that Farley did not appeal his regular grievances that were properly rejected at intake to the Regional Ombudsman and that his regular grievances were untimely according to VDOC policy. Defs. Br. Supp. 17. Neither reason is persuasive. Farley's regular grievances considered in this section fall within the ambit of PREA-related grievances, as characterized by Durbin, *see* Hr'g Tr. 144:10–16, and thus there is no time limit for those issues, OP 866.1 § VI ¶ A.1. Additionally, although the Defendants submitted grievance forms that showed Farley had not appealed the decisions to reject them at intake, they obtained these documents only from the grievance files at Dillwyn. Hr'g Tr. 41:3–7, 54:2–20. At the hearing, Farley produced appeals of these intake decisions that had been mailed to him at Buckingham, where he was housed during that point in the process. *See generally* ECF No. 47. Accordingly, the evidence shows that the Defendants are mistaken, as Farley did in fact appeal the decisions rejecting his grievances at intake.

In every instance, the Regional Ombudsman upheld the initial intake decision to reject Farley's regular grievance. Per OP 866.1, this ends the administrative review process. Hr'g Tr. 20:5–18. Completing the intake appeal process, however, may constitute proper exhaustion if Farley complied with the VDOC grievance procedure because the district court has a duty to ensure that "any defects in exhaustion were not procured from the action or inaction of prison officials," *Hill*, 387 F. App'x at 400 (quoting *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007)). Inherent in such a duty is the ability to examine the reasons VDOC officials gave for rejecting a particular grievance and determine whether such reasons prevented a prisoner from completing the regular grievance procedure through no fault of his own. *See, e.g.*, *Moore*, 517 F.3d at 726, 730 (concluding that because it determined the prison officials committed multiple errors in rejecting the prisoner's grievances—including mischaracterizing them and requiring them to contain additional information not specified in the prison's grievance policy or the PLRA—the district court erred by relying on these grievances in finding that the prisoner failed to exhaust); *Obataiye-Allah v. Clark*, No. 7:14cv159, 2014 WL 7240509, at *3 (W.D. Va. Dec. 18, 2014) (finding that the prisoner properly exhausted his remedies because he "made a good faith effort to properly complete the regular grievance procedure, but was prevented from doing so through no fault of his own by the grievance coordinator's characterization of his allegations").

Here, the characterizations of Farley's regular grievances by the Institutional Ombudsman and the Regional Ombudsman either are not supported by the evidence or are contrary to VDOC's own policies, and thus prevented Farley from complying with VDOC's grievance procedure through no fault of his own. Two of Farley's regular grievances were rejected for reasons that the Court finds not to be supported by the evidence. Farley's regular

grievance filed on October 23, 2014, concerned his fears of reprisal, in the form of a retaliatory transfer, for reporting the alleged sexual assault—acts that Farley asserted infringed his rights to equal protection and freedom from discrimination.[18] ECF No. 47-1, at 26–27. It was rejected at intake and upheld on appeal for containing insufficient information and because the issue "[did] not affect [Farley] personally. *Id.*; Hr'g Tr. 35:1–12. The Defendants argued, and Mason testified, that Farley did not appeal Mason's decision rejecting this regular grievance. Hr'g Tr. 35:13–17. Farley, however, did appeal to the Regional Ombudsman, who upheld Mason's decision. ECF No. 47-1, at 26–27. A review of the regular grievance shows that all of the information requested by Mason on the intake rejection form was easily ascertainable in Farley's original filing, and the Court finds it hard to fathom how the conduct complained of did not affect Farley personally. This regular grievance contained sufficient information to put the Defendants on notice for Claim 8 and the equal protection element of Claim 11. Therefore, Farley properly exhausted these claims.

Farley's regular grievance filed on November 7, 2014, alleges that Smith, Watson, and Thornton labeled Farley gay and threatened him with more charges, a transfer to a higher level facility, and a more hostile prison environment. *Id.* at 17. It also detailed the impact these perceived threats had on Farley. *Id.* It was rejected at intake and upheld on appeal for containing more than one issue and for not affecting Farley personally. *Id.* at 18; Hr'g Tr. 29:11–16. Mason testified that he felt Farley's complaints of being labeled, having to go on medication, and feeling threatened constituted multiple issues. *Id.* at 18; Hr'g Tr. 29:11–16. The Defendants argued, and Mason further testified, that Farley did not appeal Mason's decision rejecting this regular grievance. Hr'g Tr. 29:22–24. Farley, however, did appeal to the Regional Ombudsman,

---

[18] It is unclear how the acts alleged correlate to the asserted claims. I will address that deficiency in considering the merits of Farley's claims.

who upheld Mason's decision. ECF No. 47-1, at 17–18. Construing the regular grievance in the light most favorable to Farley, the Court finds that Farley was primarily concerned with how Smith, Watson, and Thornton handled the investigation into Farley's sexual assault complaint as a whole, and thus the regular grievance addressed only one issue. Requiring Farley to file separate grievances for each component of the investigation that he had qualms with would prevent him from accessing the grievance procedure through no fault of his own. *See Moore*, 517 F.3d at 730 (concluding that the characterization of Moore's grievance as containing more than one issue was not a proper basis for finding that Moore had not exhausted his remedies because "[a]t its essence, Moore's grievance was a complaint about being punished in various ways for conduct that he had never been informed of or charged with. Under these circumstances, requiring Moore to grieve each of the alleged components of his punishment separately would have prevented him from fairly presenting his claim in its entirety."). Also, the Court finds that the conduct complained of did affect Farley personally because it concerned the impact of Smith, Watson, and Thornton's investigation on Farley, as well as Farley's perception that the Defendants would not make their investigation into his claims a high priority and were retaliating against him for reporting an alleged sexual assault. This is sufficient information to put the Defendants on notice of Claim 5. Therefore, Farley properly exhausted this claim.

Two additional regular grievances submitted by Farley were rejected on intake and on appeal to the Regional Ombudsman. Farley's regular grievance from August 28, 2014, concerned his fear of being transferred in retaliation for making a PREA complaint regarding the alleged sexual assault he suffered in the Dillwyn showers. ECF No. 47-1, at 23. It was rejected at intake and upheld on appeal for not using the informal procedure, because it did not affect Farley personally, and because it concerned matters beyond VDOC's control, making it non-grievable.

*Id.* at 24. VDOC's own policy, however, states that inmates do not have to utilize the informal procedure when making PREA-related complaints, OP 866.1 § V ¶ A.2, and PREA-related issues are not listed as ones beyond VDOC's control, *id.* § IV ¶ M; *see also Allah v. Virginia*, No. 2:10cv75, 2011 WL 251214, at *5 (W.D. Va. Jan. 25, 2011) (concluding that VDOC's characterization of the prisoner's grievance as non-grievable and thus not eligible for intake was flawed because it relied on a justification not contained in the enumerated list of non-grievable matters). According to Durbin, PREA-related grievances include instances of sexual abuse or harassment as well as specific instances of retaliation for making a PREA complaint. Hr'g Tr. 144:10–16. Thus, the Regional Ombudsman's reasons contradicted VDOC policy regarding PREA-related complaints. Furthermore, a potential transfer in retaliation for making a PREA complaint could affect Farley personally. This regular grievance contains sufficient information to put the Defendants on notice for Claims 6 and 12, and the retaliation claim. Therefore, Farley properly exhausted these claims.

Farley's November 3 regular grievance concerned his fears of retaliation specifically for making a PREA complaint and included Farley's request to speak to the victim advocate with whom he had previously spoken. ECF No. 28-2, at 35. It was rejected at intake and upheld on appeal for not affecting Farley personally and because it concerned matters beyond VDOC's control, making it non-grievable. *Id.* at 36. A notation on the intake form also indicated that Farley should "contact PREA." *Id.* Mason testified that he believed the complained of conduct did not affect Farley personally because a transfer a quarter of a mile away would not affect Farley in terms of location. Hr'g Tr. 33:17–23. The Defendants also argued, and Mason further testified, that Farley did not appeal Mason's decision rejecting this regular grievance. *Id.* at 33:9–13. Farley, however, did appeal to the Regional Ombudsman, who upheld Mason's decision.

27

ECF No. 28-2, at 36. Again, VDOC's policy is clear that an inmate can use the grievance procedure established in OP 866.1 to report PREA-related issues, OP 866.1 § VI ¶ B.2, which, as Durbin testified, includes retaliation for making a PREA complaint, Hr'g Tr. 144:10–16. Rejecting Farley's PREA-related grievance as non-grievable because it raises a PREA-related issue is contrary to that policy. Furthermore, Mason's explanation for his decision to reject the regular grievance because it did not affect Farley personally is not persuasive. This regular grievance contained sufficient information to put the Defendants on notice for Claim 9 and Farley's retaliation claim. Therefore, Farley properly exhausted these claims.

Farley's regular grievance from November 18, 2014, was also rejected for a reason contradicted by VDOC policy. This regular grievance concerned Farley's perception that the Defendants were not following the proper procedures regarding Farley's PREA complaints, which he believed violated his equal protection rights. ECF No. 47-1, at 32. It also noted that Smith specifically told Farley to stop writing outside agencies concerning his efforts to obtain a victim advocate. *Id.* The regular grievance was rejected at intake and upheld on appeal for containing insufficient information and for not affecting Farley personally. *Id.* at 33. Regarding the insufficient information, the grievance response directed Farley to "please provide [a] witness to this accusation. Sgt. Smith stated in informal response that you are not truthful." *Id.* The grievance policy detailed in OP 866.1, however, does not require Farley to provide witnesses to verify his account in order to get past the intake stage. Thus, rejecting Farley's grievance at intake based on this reasoning is inadequate. Farley provided sufficient information in this grievance to put the Defendants on notice for Claim 17. Therefore, Farley properly exhausted this claim.

Farley's last remaining claim, Claim 2, is contained in a regular grievance that he properly appealed through to Level II. *Id.* at 15–16, 60. The Defendants maintained that this grievance was not relevant because it requested restitution from the inmate Farley accused of sexually assaulting him. The Defendants ignored, however, Farley's stated reasons for appealing the Level I decision, specifically that the Dillwyn staff was aware of his concerns that being labeled because of his sexual orientation and criminal charge would lead to his sexual victimization.[19] *Id.* at 16. This is sufficient information to put the Defendants on notice for Claim 2. The Level II response notified Farley that his concerns were being handled through PREA, and that he had exhausted all of his administrative remedies. Therefore, Farley properly exhausted this claim.

D.      *Farley's Properly Exhausted Claims on the Merits*

1.      *Summary Judgment Standard*

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Tolan v. Cotton*, --- U.S. ---, 134 S. Ct. 1861, 1866 (2014) (per curiam). Facts are material when they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute exists if "a reasonable jury could return a

---

[19] It is worth noting that OP 866.1 does state that "[a]ny issue not addressed in the original grievance will not be considered in an appeal." OP 866.1 § IV ¶ H.3. The substance of the original grievance references the alleged assault generally, ECF No. 47-1, at 60, but does not provide the same amount of detail as Farley's response to the Level I finding, *id.* at 16. The Level II response, however, does not reject Farley's response to the Level I findings in making its determination. *Id.* at 15. Moreover, Farley submitted other regular grievances covering his concerns in Claim 2. In the July 14 regular grievance that was appealed properly through Level II, Farley indicates that his bunkmates were harassing him on the basis of his charges, labeled orientation, and attempted use of the grievance procedure. *Id.* at 20–22. The Defendants did not make a Level I finding on this regular grievance until August 12, by which time the alleged sexual assault had taken place. Farley's October 23 regular grievance, as described above, also indicated that Smith, Watson, and Thornton referenced his charges and labeled sexual orientation during their investigation and implied that Farley deserved the sexual assault he reported because of these qualities. *Id.* at 26.

verdict in favor of the nonmoving party." *Kolon Indus., Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 173 (4th Cir. 2014) (citing *Anderson*, 477 U.S. at 248).

"The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Appalachian Power Co. v. Arthur*, 39 F. Supp. 3d 790, 796 (W.D. Va. 2014) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party makes that showing, the nonmoving party must then produce sufficient admissible evidence to establish a specific material fact genuinely in dispute. *See* Fed. R. Civ. P. 56(c), (e); *Scott v. Harris*, 550 U.S. 372, 380 (2007). When deciding a summary judgment motion, the court must accept well-pleaded factual allegations as true and draw all reasonable inferences in the nonmoving party's favor given the record as a whole. *See Tolan*, 134 S. Ct. at 1866; *Scott*, 550 U.S. at 380. The court does not weigh evidence, consider credibility, or resolve disputed issues—it decides only whether the record reveals a genuine dispute over material facts. *Tolan*, 134 S. Ct. at 1866.

2.   *Remaining Claims*

a.   *Rehabilitation Act Claim*

Farley alleges that the Defendants denied him access to a victim advocate, which hindered his ability to recover from PTSD and his sexual victimization, in violation of § 504 of the Rehabilitation Act (Claim 9). A claim under the Rehabilitation Act requires the plaintiff to show: "(1) he has a disability, (2) he is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) he was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of his disability." *Bane v. Va. Dep't of Corr.*, No. 7:12cv159, 2012 WL 6738274, at *11 (W.D. Va. Dec. 28, 2012) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d

474, 498 (4th Cir. 2005)).[20] "The statutory language, requiring a *substantial* limitation of a *major* life activity, emphasizes that the impairment must be a significant one." *Forrisi v. Bowen*, 794 F.2d 931, 933 (4th Cir. 1986). The Rehabilitation Act applies "only to programs receiving federal assistance," and it "requires that a plaintiff show that the [alleged] exclusion was 'solely by reason of [his or] her disability.'" *Thomas v. Salvation Army S. Territory*, 841 F.3d 632, 641 (4th Cir. 2016) (quoting 29 U.S.C. § 794).

This claim must fail because Farley has not provided any evidence that he is suffers from a disability that imposes a "*substantial* limitation of *major* life activity," *Forrisi*, 794 F.2d at 933, nor has he shown that Defendants discriminated against or denied him accommodations on the basis of any of these alleged disabilities. He asserts that he suffers from anxiety, depression, PTSD, asthma, and hearing and vision problems. Hr'g Tr. 162:5–8; Farley Aff. 2, ECF No. 30. The Defendants contend that Farley had no known disability upon arriving at Dillwyn, Edmonds Aff. ¶ 4, and that there is no documented disability on file for Farley, Hr'g Tr. 157:24–158:2. The limited medical evidence in the record affirms only that Farley was diagnosed by VDOC doctors with major depressive disorder with anxious distress and was treated with Paxil and counseling for stress management. ECF No. 47-2, at 11, 49–50. Farley also was seen at Green Rock for mental health evaluation under PREA. *Id.* at 69. None of this evidence shows that Farley had a significant limitation in a major life activity caused by his mental impairment or that

---

[20] Section 504 of the Rehabilitation Act requires that

> [n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a).

he had a record of such limitation or was regarded as having such limitation. Furthermore, no other medical evidence shows that Farley was afflicted with any of the other alleged disabilities.

Even accepting Farley has all of these disabilities and that they cause substantial limitations, he does not point to any facts demonstrating that the Defendants denied him access to a victim advocate solely because of his disability. Furthermore, Farley has not alleged any facts that show he was ever denied access to an advocate. He claims that he never received contact information for the advocate he spoke with on September 16, 2014, and that he was not permitted to speak to an advocate in private after that call. The Defendants agree that Farley never got this contact information and was not permitted to speak to another advocate in private, but maintain it was because Farley asked for the advocate's personal contact information. Durbin Aff. ¶ 7. Farley does not address the Defendants' explanation for this decision, and he also does not dispute the Defendants' repeated assertion that he had access to the victim advocate center at all times through the use of the offender telephone. *Id.* Durbin further indicated in a May 1, 2015, letter[21] to Farley that Farley had in fact utilized this option and contacted Action Alliance on numerous occasions. ECF No. 47-2, at 32. In his response to Durbin's letter, Farley continued to allege that he was not provided with contact information and afforded the opportunity to speak with an advocate in private, but he did not address Durbin's assertion that he did use the offender telephone to contact Action Alliance. *Id.* at 12–13. Consequently, although Farley may not have received face-to-face counseling at the exact time he requested it, this does not show that he was denied access to a counselor or treated differently than others solely because of his disability. Thus, because no genuine dispute of material fact exists over whether the Defendants denied

---

[21] Durbin's letter was written in response to a letter that Farley had written to U.S. Congressman Robert Scott alleging that Farley was not being provided with unimpeded access to victim advocate services. ECF No. 47-2, at 32. Durbin also notes that Farley received various medical and mental health assessments as a result of his concerns. *Id.*

Farley access to a victim advocate at all, let alone solely on the basis of his PTSD or other disabilities, the Defendants are entitled to summary judgment. Accordingly, I recommend that Claim 9 be dismissed.

b.      *Eighth Amendment Deliberate Indifference Claims*

Farley alleges that the Defendants failed to protect him and as a result he was sexually assaulted, in violation of his rights under the Eighth Amendment (Claim 2, Claim 6) and Article I, Section 9 of the Virginia Constitution (Claim 12). As prison officials, the Defendants have a duty to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526 (1984)). The Supreme Court has held that failure to protect can amount to a violation of an inmate's Eighth Amendment rights, and protecting inmates from violence at the hands of other inmates falls under this duty. *See id.* at 833.

Not every injury inflicted on an inmate by another inmate, however, shows a constitutional violation by prison officials. *See id.* at 834. In order to state an Eighth Amendment claim for failure to protect an inmate from violence at the hands of another inmate, a plaintiff must make two showings. "First, the deprivation alleged must be, objectively, 'sufficiently serious.'" *Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 770 (4th Cir. 2003) (quoting *Farmer*, 511 U.S. at 834); *see also Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) ("[O]nly extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim."). To meet this prong, the plaintiff must "produce evidence of a serious or significant physical or emotional injury." *Shakka*, 71 F.3d at 166 (quoting *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993)). "Second, a prisoner must present evidence that the prison officials had a 'sufficiently culpable state of mind.'" *Odom*, 349 F.3d at 770. To meet this prong, the plaintiff must show

33

deliberate indifference on the part of the officials. *Id.* Deliberate indifference entails "'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 835).

For the objective prong, Farley alleges that he was sexually assaulted by another inmate in the bathroom and shower at Dillwyn. "Courts have recognized, however, that not every allegation of sexual abuse is 'objectively, sufficiently serious' for purposes of the Eighth Amendment." *De'Lonta v. Clarke*, No. 7:11cv483, 2013 WL 209489, at *4 (W.D. Va. Jan. 14, 2013) (citing *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010); *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997)). As a result, "courts must conduct a fact-intensive, case-by-case inquiry to determine if the sexual abuse was sufficiently serious." *Id.* Here, Farley maintains that a fellow inmate groped and anally penetrated him against his will. Compl. 9. Accepting Farley's version of the incident as true, both kinds of conduct fall under the definition of "rape" according to PREA. *See* 42 U.S.C. § 15609(8). Although there is scant medical evidence in the record to confirm the extent of Farley's injuries, the evidence is undisputed that he sustained injuries to his rectum as a result of the latter incident. Smith Aff. ¶ 8. Farley also states that he was traumatized as a result of this encounter. Pl. Br. Opp'n 13. Therefore, viewing the evidence in the light most favorable to Farley, he meets the objective prong on the Eighth Amendment claims.

For Farley to prevail on the subjective prong, he must show that the Defendants were more than merely negligent and that they deliberately disregarded his complaints, leading to his sexual assault. *See Makdessi*, 789 F.3d at 134 ("[P]rison officials may not simply bury their heads in the sand and thereby skirt liability."). Farley alleges that the Defendants were aware of his high-risk sexual victim status and their failure to grant his request to shower alone led to

34

sexual victimization at the hands of another inmate. Before the alleged assault occurred, Farley submitted two informal complaints, one on July 8, 2014, and another on July 11, complaining of harassment and intimidation from other inmates. ECF No. 47-1, at 52, 58. He also submitted an offender request on July 12 seeking written permission to shower alone after 11:30 p.m. because he had been victimized at another institution, *id.* at 67, and one regular grievance on July 14 articulating his concerns of harassment, intimidation, and threats coming from other prisoners, *id.* at 22.

Construed liberally, these attempts by Farley should have put the Defendants on notice that he was concerned about being verbally harassed, intimidated, and threatened with violence by his fellow inmates. Whether it also put the Defendants on notice of a potential sexual assault, however, is ultimately not necessary to decide because even if it did, the Defendants' actions in response to Farley's communications do not rise to the level of deliberate indifference. The Defendants' initial response after Farley filed his first informal complaint on July 8 was immediately to move Farley to the front of his dorm in order to allow staff in the control room, which is staffed twenty-four hours a day, seven days a week, to monitor him to best ensure his safety. ECF No. 47-1, at 52; Hr'g Tr. 123:4–9, 21–25. When Farley was subsequently moved to a different dormitory for his safety and job assignment, he was again placed at the front of the dorm to ensure that he could still be monitored because he had reported being threatened with violence owing to the nature of his conviction. ECF No. 43-1 at 67; Hr'g Tr. 126:19–127:4.

Warden Edmonds also testified about denying Farley's request to shower alone. He noted that Farley's request could not be accommodated because Farley did not present an adequate reason to justify it and because no other inmates housed in the Dillwyn dormitories were

35

permitted to shower alone.[22] Hr'g Tr. 122:2–19. Furthermore, he testified that the Dillwyn staff monitored the showers at all times,[23] *id.* at 122:11–12, and that Farley was informed that the showers were open for two or three hours in the morning and several hours in the evening, giving him plenty of options to shower when no other inmates were present, *id.* at 122:4–11. Farley's regular grievance from July 14, in which he alluded to other inmates threatening to rape him, was promptly accepted for intake and was in the process of being investigated when the alleged sexual assault took place. ECF No. 47-1, at 20–22. No evidence shows, however, that the inmate accused of sexual assault by Farley was part of the group of inmates referenced in the regular grievance. Moreover, after Farley was moved from the first dormitory, he did not report any instances of harassment until he submitted the anonymous letter detailing the alleged sexual assault by Graves.[24]

To prevail on a deliberate indifference claim, Farley has to prove that the Defendants were more than merely negligent. While Farley had brought his fears of sexual harassment to their attention before the alleged sexual assault, as described above, the Defendants promptly responded to his complaints with reasonable efforts to ensure his safety. *See Farmer*, 511 U.S. at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be

---

[22] Warden Edmonds did testify that an accommodation might be made for a valid reason, such as if an inmate was transgender, but he maintained that the inmate would have to present proper documentation and evidence along with such a request. He reaffirmed that Farley had offered no documentation to necessitate such an accommodation and asserted that, although Farley had complained about being sexually assaulted at a previous prison, he was not aware of any evidence that the assault had occurred. Hr'g Tr. 129:4–10.

[23] The showers at Dillwyn are not individual showers, but rather are open so multiple inmates can shower at the same time. Hr'g Tr. 130:17–20. Relatedly, Warden Edmonds also testified about other conditions in the bathrooms, such as door-less stalls separated only by partitions. *Id.* at 130:21–24. Warden Edmonds clarified that this layout was necessary because there still had to be an opportunity for staff to view inside the stalls as well as the showers. *Id.* at 131:3–5.

[24] Although Farley alleges that he tried to notify Smith and Edmonds of Graves's advances, he offers no details of these notifications. Moreover, he provides no evidence to show the Defendants were aware of these or any other problems after he was moved to the second dormitory.

found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."). After the alleged assault took place, the Defendants also responded reasonably, starting by immediately initiating an investigation. Watson testified that he viewed the surveillance video for the times Farley alleges he was assaulted, and Watson could not see evidence of the assault. Farley has not alleged that the encounter was lengthy or in other ways should have caught the attention of the guards. The Defendants also took Farley to MCV/VCU for treatment, housed him in medical upon his return, set up a phone call with a victim advocate, and transferred him to Buckingham to accommodate his requests for a single cell and safer shower facilities.

Given these circumstances, and taking as true Farley's account that an assault occurred, I cannot find that the Defendants' responses to Farley's requests were unreasonable or rose to the level of deliberate indifference. *Cf. Makdessi*, 789 F.3d at 135 (vacating and remanding a judgment for prison officials when Makdessi, described as a small, vulnerable prisoner who had made repeated complaints to prison officials concerning his fear of abuse from fellow inmates, had been placed in a cell with an aggressive prison gang member who sexually assaulted Makdessi). Therefore, the undisputed evidence shows that Farley's claim against the Defendants for deliberate indifference due to his alleged sexual victimization in the shower at Dillwyn fails as a matter of law, and the Defendants are entitled to summary judgment. Accordingly, I recommend that Claims 2, 6, and 12 be dismissed.

> c. *Equal Protection Claims*

Farley alleges that the Defendants violated his right to equal protection.[25] The Fourteenth Amendment's Equal Protection Clause requires states to treat similarly situated individuals alike

---

[25] Farley alleges a violation of his right to equal protection generally under both the Fourteenth Amendment (Claim 8) and Article I, Section 11 of the Virginia Constitution (Claim 11). He also alleges

under the law. *Plyler v. Doe*, 457 U.S. 202, 216 (1982); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). To succeed on an equal protection claim, Farley must show that "he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). Generally, under such a claim, if the challenged policy interferes with a fundamental constitutional right or uses a suspect classification, such as race or national origin, then it is subject to strict scrutiny. *Id.* In the prison context, however, "courts must adjust the level of scrutiny to ensure that prison officials are afforded the necessary discretion to operate their facilities in a safe and secure manner. . . . [And] therefore, [the court] must determine whether the disparate treatment is 'reasonably related to [any] legitimate penological interests.'" *Veney v. Whych*, 293 F.3d 726, 732 (4th Cir. 2002) (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 (2000)). "This more deferential standard applies even when the alleged infringed constitutional right would otherwise warrant higher scrutiny, such as when an inmate claims that his constitutional right to equal protection of the laws has been violated." *Morrison*, 239 F.3d at 655 (citation omitted).

Farley's equal protection claim rests on vague, conclusory allegations in the complaint. To the extent that it can be ascertained, it appears that Farley primarily assails the Defendants' treatment of him during the investigation into his sexual assault allegations, his subsequent transfer, and his ability to benefit from VDOC's PREA policies. His claims here fail, however, for myriad reasons. Farley does not identify a fundamental constitutional right infringed by the

---

that his exclusion from the PREA process violated his right to equal protection (Claim 17). Because the equal protection clause in the Virginia Constitution affords no greater protection to be free from government discrimination than the equal protection clause in the Fourteenth Amendment, the same analysis applies to Farley's claims under both his federal and state law claims. *See Lee v. York Cty. Sch. Div.*, 418 F. Supp. 2d 816, 835 (E.D. Va. 2006); *Archer v. Mayes*, 194 S.E.2d 707, 711 (Va. 1973).

Defendants, nor does he identify himself as a member of a protected class. He alleges at different times in his filings discrimination on the basis of his labeled sexual orientation, the nature of his crime, and his attempts to report PREA violations. With the possible exception of being labeled homosexual, *see generally Obergefell v. Hodges*, --- U.S. ---, 135 S. Ct. 2584 (2015) (recognizing that state laws denying same-sex couples the right to marry violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment), none of the groups Farley identifies creates a suspect classification.

Furthermore, Farley does not offer any evidence that the Defendants treated him differently than others with whom he is similarly situated. There is no evidence before the Court regarding another investigation by the Defendants into a sexual assault complaint, a subsequent transfer, or other inmates' attempts to report PREA violations to VDOC. Even assuming Farley did present such evidence and could demonstrate that the Defendants treated him differently, he does not show that such treatment was the result of intentional or purposeful discrimination based on any of the asserted classes. *See Morrison*, 239 F.3d at 654. Here, the Defendants promptly investigated Farley's alleged sexual assault and transferred him to a housing assignment that met his requested accommodations for a single cell and shower. Farley simply relies on general accusations and his own conclusions in making claims that he suffered discrimination in violation of his rights to equal protection. This does not, however, result in a showing of discrimination. *See Farley v. Stoots*, 2015 WL 6690237, at *8 ("[Farley] cannot rely on buzzwords, labels, or conclusions to state a violation of a federal right." (citing *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007)). Therefore, Farley has not demonstrated a genuine dispute of material fact showing he was denied his equal protection rights, and the Defendants

are entitled to summary judgment. Accordingly, I recommend that Claims 8 and 11 (as to equal protection) be dismissed.

        *d.*     *Due Process Claim*

Farley's due process claim (Claim 5) stems from his dissatisfaction with the investigation into his sexual assault complaint. Evaluation of a Fourteenth Amendment procedural due process claim requires a two-step analysis. First, the Court must determine if the plaintiff had a protectable liberty interest arising under either the Constitution or state law. *Wilkinson v. Austin*, 545 U.S. 209, 226 (2005). An inmate has a liberty interest in avoiding conditions of confinement that impose "atypical and significant hardship on the inmate in relation to ordinary incidents in prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Determining if the conditions are atypical and impose a significant hardship on the inmate is a fact-specific exercise. *See Beverati v. Smith*, 120 F.3d 500, 503 (4th Cir. 1997). Additionally, a due process violation requires intentional or deliberate, not merely negligent, conduct. *See Pink v. Lester*, 52 F.3d 73, 75 (4th Cir. 1995) ("The term 'deprive,' as employed in the Fourteenth Amendment, suggests more than a mere failure to take reasonable care: it connotes an intentional or deliberate denial of life, liberty, or property."). If a liberty interest does exist, then the court must proceed to the second step of the analysis and evaluate whether the prisoner received the minimally adequate process required to protect that interest. *Incumaa v. Stirling*, 791 F.3d 517, 526 (4th Cir. 2015). If there is no protectable liberty interest, however, then no process is due. *Wilkinson*, 545 U.S. at 221. ("We need reach the question of what process is due only if the inmates establish a constitutionally protected liberty interest . . . .").

This claim fails on the first prong because Farley does not identify a protected liberty interest that Smith, Watson, or Thornton infringed. Moreover, the investigation of Farley's

sexual assault complaint against another offender did not impose "atypical and significant hardship" on Farley; in fact, it was undertaken for Farley's benefit, and Farley suffered no actionable deprivation as a result of the investigation. He was treated at all times as the victim, even though the Defendants began to regard his report with skepticism as their investigation of the alleged sexual assault progressed. That Smith and Watson did not come to the result Farley desired does not give rise to a due process claim. Because Farley cannot demonstrate the deprivation of a liberty interest no process was due to him. There is no need to consider the second step of the due process analysis, and the Defendants are entitled to summary judgment. Accordingly, I recommend that Claim 5 be dismissed.

e.    *Retaliation Claim*

Throughout his complaint, Farley claims that because he reported the alleged sexual assault, the Defendants retaliated against him in the manner of conducting their investigation and by transferring him to Buckingham. A claim for retaliation under § 1983 requires an inmate to provide "specific facts to establish that (a) in response to his exercise of a constitutionally protected right, (b) the defendant took some action that (c) adversely impacted or injured him and his ability to exercise his constitutional right." *Makdessi v. Fleming*, No. 7:13cv79, 2014 WL 5384596, at *2 (W.D. Va. Sept. 22, 2014) (citing *Adams*, 40 F.3d at 74). An inmate must present more than conclusory allegations of retaliation, *Adams*, 40 F.3d at 74–75, and "[h]e must demonstrate that his exercise of his constitutional right was a 'substantial' or 'motivating' factor behind the allegedly retaliatory action." *Makdessi*, 2014 WL 5384596, at *2 (citing *Wagner v. Wheeler*, 13 F.3d 86, 90–91 (4th Cir. 1993)). The Fourth Circuit has instructed district courts to regard retaliation claims by inmates "with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions." *Adams*, 40 F.3d at 74.

41

Farley has not shown that any part of the investigation of his reported assault was retaliatory. The Defendants promptly secured medical care for him, placed him in the medical unit for his protection and treatment, maintained him in a safe housing situation, and promptly and thoroughly investigated his report. During the investigation, the Defendants developed a belief that Farley's alleged sexual assault was a consensual act with another inmate and therefore not substantiated. Watson asked Farley probing questions consistent with his developing findings that Farley's report was not credible. Nothing in Farley's allegations shows that the investigation was conducted in a retaliatory manner.

The Defendants also maintained that the transfer was not retaliatory and was in response to Farley's own requests to best ensure his safety. The undisputed evidence supports this contention. For example, Farley repeatedly requested a single cell, which was not available at Dillwyn, but was available at Buckingham. Hr'g Tr. 127:5–15. Farley also requested permission to shower alone at Dillwyn, which Warden Edmonds denied because of the shower design, *id.* at 129:3, but Buckingham's design permitted Farley to use an individual shower, *id.* at 72:15–18. Moreover, Durbin specifically cited these two reasons in explaining why she thought a transfer to Buckingham could best accommodate Farley's requests and ensure his safety. *Id.* at 135:4–9. Farley has never disputed this rationale, to which the Defendants have consistently adhered. The Defendants also made sure that Farley retained the same work assignment at Buckingham. Furthermore, none of Farley's fears regarding the transfer have materialized, as Farley admitted at the evidentiary hearing that he had encountered no problems in his almost two years at Buckingham. *Id.* at 168:3–6. As such, it cannot be said that Farley experienced harm as a result of the transfer.

In essence, Farley has offered nothing in support of his argument that either the investigation into his claims or his transfer was retaliatory except for his own perception of the events, and he has not shown that either event caused him any harm. Thus, there is no genuine dispute of material fact concerning Farley's transfer, and the Defendants are entitled to summary judgment. Accordingly, I recommend that Farley's retaliation claim be dismissed.

### 3. Farley's Cross-Motion for Summary Judgment

Farley filed his own motion for summary judgment, in which he repeats the same arguments contained in his complaint without providing new, admissible evidence for the Court to consider. He focuses primarily on the Defendants' exhaustion challenge, which, as noted above, his claims for the most part survive. Farley does not, however, present facts or arguments that demonstrate any cognizable cause of action against the Defendants. The analysis in this Report and Recommendation shows that the Defendants are entitled to summary judgment even when viewing the evidence in the light most favorable to Farley; this conclusion does not change when viewing the evidence in the light most favorable to the Defendants, which I must do in considering Farley's motion for summary judgment. Therefore, I recommend that the presiding District Judge deny Farley's motion for summary judgment.

## IV. Farley's Motion for a Preliminary Injunction

Farley filed a motion for a preliminary injunction in which he requested the Court to order all "officers, agents, employers, and all persons acting in concert or participating with them, including defendants to restrain themselves from harassing, discriminating, retaliating, and depriving plaintiff of his protected freedoms protected by law." Pl. Mot. Prelim. Inj. 1, ECF No. 50. He provides no evidence in support of these vague, blanket assertions.

A preliminary injunction is an "extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). Farley must establish four elements before a preliminary injunction may issue: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Farley must demonstrate more than a mere "possibility" of irreparable harm because such a standard is "inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 23. Farley must also establish a relationship between the injury claimed in the motion for preliminary injunctive relief and the conduct giving rise to a complaint. *Omega World Travel v. TWA*, 111 F.3d 14, 16 (4th Cir. 1997). Farley fails to sufficiently address each of the four factors.

For the first factor, Farley's motion primarily concerns events that have taken place at Buckingham, and seeks to bring new claims against the Defendants and myriad unknown persons. Farley's present suit is entirely concerned with events that took place at Dillwyn. To the extent that Farley wishes to bring new claims against additional persons, he cannot do so through a motion for a preliminary injunction, but rather, must file a new civil action regarding the events that took place at Buckingham. As for the parts of Farley's motion that concern the claims in this suit, he is not likely to succeed on the merits in light of the above analysis concluding that the Defendants are entitled to summary judgment on all such claims.

Farley fails to establish that he is likely to suffer irreparable harm in the absence of preliminary relief. His motion merely makes conclusory allegations that he "is currently suffering losses of his protected rights and punishments for attempting to exercising them,"

which has led to "irreparable injury and harm . . . being wantonly inflicted upon [him]." Pl. Mot. Prelim. Inj. 1. At the evidentiary hearing, however, Farley admitted he had encountered no issues in his single cell at Buckingham, Hr'g Tr. 168:3–6, and the conclusory allegations made in the present motion are not entitled to an assumption of truth, *see Twombly*, 550 U.S. at 555.

The balance of equities does not tip in Farley's favor, as Farley requests the Court to broadly intervene in prison administration, intervention which would exceed the Court's authority to grant injunctive relief, *see* 18 U.S.C. § 3626(a)(2) ("Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm"), and would fail to afford VDOC the deference required to operate its facilities, *see Florence v. Bd. of Chosen Freeholders*, --- U.S. ---, 132 S. Ct. 1510, 1515 (2012) ("The difficulties of operating a detention center must not be underestimated by the courts. . . . Maintaining safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face."). Furthermore, Farley's motion seeks mandatory relief that would operate as deciding the case in his favor, rather than relief to maintain the status quo. While the factors required to demonstrate the need for both types of relief are the same, the Fourth Circuit has emphasized that courts should exercise their power to issue mandatory injunctive relief with caution. *See Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980) ("Mandatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief.").

Farley does not introduce anything relevant to indicate that an injunction in his favor would be in the public interest. He asserts that "[p]ublic interest is best served when an

45

injunction is issued to protect First Amendment rights," and that "where VDOC is a product of state/federal law, granting this motion will serve public interest." Pl. Mot. Prelim. Inj. 3. Farley, however, has presented no cognizable claims regarding his First Amendment rights in either his complaint or the present motion. Additionally, the mere fact that VDOC is a creation of law, without more, does not demonstrate that granting Farley's motion would serve the public interest. Therefore, I respectfully recommend that Farley's motion for a preliminary injunction be denied.

## V. Conclusion

Accordingly, I find that the Defendants are entitled to summary judgment as to each of Farley's claims. Therefore, I respectfully recommend that the presiding District Judge **GRANT** the Defendants' motion for summary judgment, ECF No. 27, **DENY** Farley's motion for summary judgment, ECF No. 33, and motion for a preliminary injunction, ECF No. 50, and **DISMISS** this case from the Court's active docket.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record and to the pro se Plaintiff.

ENTER: December 27, 2016

Joel C. Hoppe
United States Magistrate Judge